**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHARAH C., | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 cv 3261 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| ANDREW M. SAUL, Commissioner of | ) | |
| the Social Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Charah C.[2] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his disability benefits. Plaintiff has filed Plaintiff's Brief [dkt. 19], which the Court has construed as a motion for summary judgment. The Commissioner has filed a cross-motion for summary judgment [dkt. 26]. As detailed below, the Court grants the Commissioner's motion for summary judgment [dkt. 26] and denies the Plaintiff's motion for summary judgment [dkt. 19].

## I. Background

### a. Procedural History

On March 9, 2015, Plaintiff applied for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423(d), alleging a disability onset date of February 15, 2015. [Administrative Record ("R.") 20, 148.] Plaintiff cited the following conditions as the basis of his claim: blindness in the right eye and visual disturbance in the left. [R. 124.] He also noted that he had a colostomy bag, the result of a perirectal abscess, though he did not list this

---

[1]    As of June 4, 2019, Andrew M. Saul is the Commissioner of the Social Security Administration. Pursuant to Federal Rule Civil Procedure 25(d), he is hereby substituted as Defendant.

[2]    In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by his first name and the first initial of his last name(s).

as a disability basis. [R. 102-110, 124, 162.]

At the time of Plaintiff's DIB application, Plaintiff was receiving Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1382, in accordance with Administrative Law Judge ("ALJ") Shirley Moscow Michaelson's December 15, 2009 decision, finding him disabled. [R. 94-100, 160, 223.] ALJ Michaelson concluded Plaintiff's visual impairment met the requirements of Listing 2.03: Contraction of the Visual Field in the Better Eye. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.03. Plaintiff was "legally blind," lacking central vision in his right eye (20/200 with pinhole vision) and sufficient visual acuity in the "better" eye, the left (20/80 at best, also with pinhole vision).[3] *Id.*

On June 19, 2015, the Social Security Administration ("SSA") determined that Plaintiff was no longer disabled under the Social Security Act, namely because his left eye had improved. [R. 102-109, 120-23.] On July 29, 2015, Plaintiff completed a request for reconsideration with the SSA. [R. 125-26.] On August 21, 2015, the SSA issued a notice to Plaintiff maintaining its denial of his claim. [R. 127.] The notice indicated that the initial and additional records were reviewed by a physician and disability examiner in the State agency. *Id.* The reviewers found that Plaintiff's conditions—his right eye's blindness, left eye's visual disturbance, as well as his perirectal abscess and colostomy bag[4]—prevented him from doing some work but did not exclude him working altogether. *Id.*

After his DIB applications were denied initially and on reconsideration, Plaintiff requested

---

[3]    Specifically, Plaintiff met the requirement of listing 2.03A, applicable where the claimant's field of vision in the better eye is "no greater than 20 degrees." 20 C.F.R. Pt. 404, Subpt. P, App'x. 1, § 2.03A.

[4]    According to the Administrative Record, Plaintiff's perirectal abscess and colostomy bag were first introduced as alleged disability bases sometime between June 19, 2015, and August 21, 2015. The August 21, 2015 notice accompanying the second Disability Determination and Transmittal form indicate these conditions were alleged bases of disability [R. 119]. However, according to the SSA's reconsideration materials, Plaintiff did not contend his abscess and colostomy bag made him disabled: In the reconsideration materials, only blindness and visual disturbance are listed as bases for disability. [R. 111-18.] The abscess and colostomy bag are referenced solely under "new medical conditions" section, in passing, and in supplementary Rush records. It therefore appears Plaintiff had no intention of claiming these conditions as bases for disability until the SSA introduced the possibility of his doing so.

an administrative hearing. [R. 110, 119, 131-32.] In January 2017, Plaintiff appeared *pro se*,[5] having waived his right to representation, at a hearing before ALJ Bonny S. Barezky. [R. 71-93.] During the hearing, Plaintiff and a vocational expert ("VE") Brian L. Harmon testified. *Id*. On May 24, 2017, the ALJ determined that Plaintiff was not disabled under the Act. [R. 20-28.]

On June 8, 2017, Plaintiff, still *pro se*, submitted his request for review of the ALJ's decision to the Appeals Council. [R. 144.] A month later, he retained counsel. [R. 10-12.] On or about September 8, 2017 Counsel supplemented Plaintiff's request for review. [R. 223-34.] In his supplementary letter to the Appeals Council, Plaintiff's counsel contended ALJ Barezky's decision was "not logical" and failed to "reflect a properly developed record," establishing Plaintiff as disabled. Additionally, counsel asserted specifically, "[t]he entire basis of his disability is blindness." [R. 223.]

On April 10, 2018, after a review of the ALJ's decision, the Appeals Council denied Plaintiff's Request for Review of ALJ Barezky's decision. [R. 1-3.] Thus, the Decision of the Appeals Council is the final decision of the Commissioner. Plaintiff filed an action in this Court on May 8, 2018, seeking review of the Commissioner's decision.

### b. Relevant Medical Background

Plaintiff, born in 1970, was 44 years old on his alleged disability onset date. [R. 148-49.] Plaintiff's relevant medical conditions are his macular degeneration of the right eye and limited visual acuity of the left eye, referenced in the first part of this section, as well as his perirectal abscess and colostomy, referenced in the second part of this section.

### i. Plaintiff's Vision

In May 2008, Plaintiff sustained blunt force trauma to his right eye when he was struck by

---

5      Plaintiff appeared *pro se* at the January 2017 ALJ hearing, but retained counsel on July 7, 2017. [R. 10-12.]

a pistol. [R. 99.] Plaintiff underwent consultative evaluations in July and September of 2008, as well in January of 2009 with Dr. Tracy Matchinski, O.D. [R. 99.] With respect to the right eye, the results were consistent, and the physicians reached a consensus. *Id.* Plaintiff had significant vision loss that left him legally blind. *Id.* More specifically, his right eye's visual acuity was less than 20/200 with a pinhole field of vision. *Id.* Additionally, it was determined Plaintiff would not, in all likelihood, recover that vision. *Id.* This was so because the eye presented with a "full thickness macular tear," the consequence of an irreversible condition: macular degeneration. *Id.*

Unlike the right eye, the physicians found the left eye to be healthy at first. *Id.* At the September 8, 2008 evaluation, Plaintiff's left eye vision tested as 20/20. *Id.* However, by January 2009, his left eye vision declined; Dr. Matchinski's results ranged from 20/80 to 20/200. *Id.* At the time of ALJ Michaelson's December 2009 decision, according to the records, Plaintiff was shown to have "no central vision" in the right eye and in the left "visual acuity [of] 20/100 with only a pinhole vision," when corrected. *Id.* Both eyes had pinhole vision. *Id.* These findings taken together meant that, in 2009, Plaintiff was legally blind. [R. 100.]

At the time of Plaintiff's 2015 DIB application, he maintained that he qualified as disabled under the Act because of his vision. [R. 102, 159-60, 222-24.] On May 29, 2015, Plaintiff was examined by Dr. David Hillman, M.D., who performed an Ophthalmology Consultative Examination. [R. 446-47.] At that examination, Dr. Hillman found that Plaintiff had significant vision loss in the right eye: his vision in that eye "could not be plotted due to poor vision," and the only metric obtained demonstrated that, when using the right eye alone, Plaintiff could recognize hand motions from a distance of two feet. [R. 446.] As for his left eye vision, Dr. Hillman found that, when corrected, Plaintiff's visual acuity in the left eye was 20/40. *Id.* Dr. Hillman noted Plaintiff's left eye was healthy and its field of vision was "essentially full." *Id.* This constituted a dramatic improvement from the left eye vision results from 2009. [R. 99.]

Dr. Hillman's findings are consistent with the 2015 record, which notes Plaintiff's macular degeneration and baseline blindness in the right eye throughout but references only "decreased vision" the left eye, if even that. [R. 254, 260, 468, 483.] Plaintiff has not disputed the 2015 record or consultative examination results with respect to his left eye vision, nor has he indicated his vision in that eye has since declined. [R. 73-93.]

### ii. Plaintiff's Perirectal Abscess and Colostomy Bag

On February 15, 2015, the alleged disability onset date, Plaintiff was admitted to the hospital with symptoms of gluteal pain, swelling, and draining. [R. 246.] Plaintiff underwent perianal abscess drainage with primary fistulotomy. *Id.* Plaintiff was then diagnosed with a necrotizing soft tissue infection affecting the right and left perirectal and gluteal areas, the left ischiorectal fossa, and the anterior perineum. [R. 284.] On February 16, and 23, 2015, physicians performed surgeries on Plaintiff to remedy his physical ailments; among them was a sigmoid loop colostomy. [R. 260.]

On July 2, 2015, Plaintiff attended a follow-up appointment with his surgeon, Dr. Joanne Favuzza, M.D. [R. 477-78.] The surgeon found that Plaintiff's wound was healed and no further dressing changes were needed. *Id.* The wound site looked good and Plaintiff showed no bodily "fluctuance or swelling." *Id.* However, while Plaintiff did complain of right scrotal pain and occasional perineal pain, Dr. Favuzza noted that Plaintiff had not sought treatment for any pain prior to this follow-up visit. *Id.* In fact, when it came to his pain, Plaintiff indicated he stopped using Tylenol and Ultram for pain management due to their "side effects." *Id.* He reported he was instead "self treating his pain [though] he would not disclose how he was 'dealing' with this pain" *Id.* Dr. Favuzza noted Plaintiff "should not require any pain medication and will not be receiving any prescriptions for narcotics." [R. 478.] She referred him to a urologist to discuss his scrotal pain. *Id.*

On July 9, 2015, Plaintiff then followed up with Dr. Megan Gayeski, M.D., to whom he reported groin irritation and pain. [R. 473-76.] Plaintiff was prescribed topical creams and referred him to dermatology and urology. *Id.* Dr. Gayeski reiterated to Plaintiff "that his surgeon [Dr. Favuzza] stated that he should not need narcotics at this time." [R. 476.]

There is no indication that Plaintiff sought additional pain treatment beyond that date in the record. In October of 2015, Plaintiff attended his last follow-up appointment with Dr. Favuzza. [R. 658.] At that appointment, it was determined that Plaintiff's groin pain was resolved, and the wound was healed. *Id.* There were no reported issues with his colostomy bag. *Id.* Plaintiff was therefore discharged from surgical follow-up. *Id.*

### c.    The ALJ's Decision

On May 24, 2017, the ALJ issued a written decision denying Plaintiff disability benefits. [R. 17-28.] As an initial matter, the ALJ found that Plaintiff met the insured status requirements of the Act through December 31, 2018. [R. 22.] At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity since his alleged onset date of February 15, 2015. *Id.* At step two, the ALJ found that Plaintiff suffered from the following severe impairments: perineal infection requiring colostomy and macular degeneration of the right eye due to trauma in 2005. *Id.* The ALJ did not specifically articulate any nonsevere impairments, but noted that "[a]ll impairments other than those enumerated above, alleged and found in the record, are nonsevere or not medically determinable as they have been responsive to treatment, cause no more than minimal vocationally relevant limitations, have not lasted or are not expected to result in more than minimal work-related restriction for a continuous period of at least 12 months, are not expected to result in death, and/or have not been properly diagnosed by an acceptable medical source defined in the regulations." *Id.* At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed

impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. *Id.* At step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[6] to perform medium work. The exceptions are: after sitting 20 minutes at a time in one position, he must change positions, and he has limited (occasional) near acuity. [R. 23.] At step five, the ALJ found Plaintiff capable of performing his past relevant work as a home attendant, which according to Dictionary of Occupational Titles ("DOT") No. 354.377-014 constitutes as medium, semiskilled work. [R. 26.] Additionally, the ALJ found, given Plaintiff's RFC, age, education, and work experience in conjunction with the Medical-Vocational guidelines, 20 CFR Part 404, Subpart P, App'x 2, Plaintiff could perform a series of alternative jobs, existing in the national economy in significant numbers, each unskilled, of medium exertion, and not requiring near acuity: he could serve as a kitchen helper (DOT No. 318.687-010), a hospital cleaner (DOT No. 323.687-010), and a laundry worker (DOT No. 361.68-018). [R. 27-28.] Accordingly, the ALJ found Plaintiff not disabled under the Act. [R. 28.]

## II. Social Security Regulations and Standard of Review

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of

---

[6]    RFC is defined as the most one can do despite one's impairments. 20 C.F.R. §§ 404.1545, 416.945.

performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id*. At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's RFC in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). While reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001. Although the Court reviews the ALJ's decision deferentially, the ALJ must nevertheless "build an accurate and logical bridge" between the evidence and his conclusion. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). Even where "reasonable minds could differ" or an alternative position is also supported by substantial evidence, the ALJ's judgment must be affirmed if supported by substantial evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Scheck*, 357 F.3d at 699. On the other hand, the Court cannot let the Commissioner's decision stand if the decision lacks sufficient evidentiary support, an adequate discussion of the issues, or is undermined by legal error. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535,539 (7th Cir. 2003); *see also*,

42 U.S.C.§ 405(g).

## III.   Discussion

The Plaintiff alleges the ALJ made reversible errors in two areas: Plaintiff's RFC finding and the assessment of Plaintiff's subjective statements. The Court addresses these issues in turn.

### a.   The ALJ Properly Assessed Plaintiff's RFC

The ALJ's RFC assessment evaluates the limitations posed by Plaintiff's two severe physical impairments: the 2015 perineal infection requiring a colostomy bag, and macular degeneration of the right eye.[7] Plaintiff takes issue with the analysis and conclusions drawn on his limitations caused by the impairments related to both his colostomy bag and vision. However, the Court finds error in neither of these areas.

### i.   Plaintiff's Perirectal Infection and Ostomy Bag

According to Plaintiff, the ALJ first erred by not explaining why she included a functional restriction that Plaintiff needed to change positions every 20 minutes of sitting, as such did not seem to accommodate and rationally relate to his use of an ostomy bag. Also according to Plaintiff, the ALJ additionally failed in not addressing why she did not introduce a restriction to: 1) reduce the amount of lifting, carrying, or postural activities Plaintiff could perform, any one of which might disconnect Plaintiff's ostomy bag or (2) add additional bathroom breaks for Plaintiff, whereby he would empty his ostomy bag and ensure its properly connection. [Dkt. 19.] In fact, by determining Plaintiff could lift, carry, and engage in postural activities for six hours of the day without additional bathroom breaks, the ALJ cast Plaintiff as capable of medium level work—another error according to Plaintiff, because she failed to explain why that level was appropriate rather than a more restrictive one.

---

[7]   As the Commissioner's brief notes, Plaintiff does not contest that these are his only two severe physical impairments [dkt. 19, 27, 28].

Plaintiff's first claim—the ALJ failed to explain how including a functional restriction that permitted Plaintiff to sit for 20 minutes at a time before changing positions accommodated and rationally related to his use of an ostomy bag—is baseless. The ALJ concluded Plaintiff must change positions every 20 minutes after being seated because Plaintiff said so in his 2015 hearing testimony. [R. 77.] After being asked how often he had to adjust positions, Plaintiff replied, "about 20 minutes." *Id.* Plaintiff explained this was so because, though the colostomy wound healed, "the nerves [were] still damaged," making it "hard to sit down on hard surfaces for long periods of time." [R. 76.] By making this statement, Plaintiff drew a clear connection between the behavior of adjusting in a seat every 20 minutes, and his condition caused by his perirectal infection and ostomy bag. Moreover, the ALJ expressly stated such: "[Plaintiff]'s use of an ostomy bag…is fully accommodated in the medium [RFC]…with restrictions on the length of time he can sit *as indicated in his testimony*." [R. 26] (emphasis added). The notion Plaintiff missed how the restriction accommodated or rationally related to his use of his ostomy bag is thus inconceivable. From the testimony to her conclusion, the ALJ built a clear "logical bridge" to which the Court must show deference. *Spicher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (internal citation omitted). Accordingly, the Court refuses to remand on this basis.

As for the other ostomy bag-related claims—that the ALJ failed to reduce the amount of lifting, carrying, or postural activities that Plaintiff would perform and to include a term allowing Plaintiff to take additional breaks to use the bathroom to empty his colostomy bag and ensure its proper attachment—the Court likewise considers both these claims meritless. The ALJ's assessment of Plaintiff as capable of lifting up to 50 pounds and standing, walking, and performing postural activities for six hours a day, without additional breaks, is without error: it comports with

Plaintiff's own testimony[8] and the medical record.[9]

Because of the vast evidence Plaintiff was regularly mobile for the duration of a normal working day despite having an ostomy bag, the ALJ found Plaintiff met the base requirements of medium level work with the exception of the sitting restriction. [R. 83*; see also* 20 C.F.R. § 220.132(c); Social Security Act, SSR 83-10, 1983 WL 31251, at *6 (expressing that medium work requires lifting "no more than 50 pounds," on an infrequent basis and "standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday").] She relied on the evidence that, by the time of Plaintiff's alleged onset date, Plaintiff's ostomy bag was no longer limiting him. [R. 25-26.] Specifically, substantiating her finding, she pointed to the various activities he attended to independently without trouble; his testimony indicating "he could lift up to 50 pounds;" and his admission "he stopped working on the alleged onset date because the person he was caring for[]…passed away…and that his unemployment was therefore not the result of his medical conditions…[H]is ostomy condition was resolved and no longer required care…" *Id.*

By addressing Plaintiff's ability to move freely and independently throughout the day,[10] his ability to lift 50 pounds, and his lack of colostomy bag limitations (it was problematic only for sitting and highly strenuous activity), the ALJ directly acknowledged just how Plaintiff's RFC

---

[8]    Specifically, Plaintiff provided testimony he could lift "50 pounds probably," if he used his back right. [R. 83.] He also asserted he "[didn't] have a walking problem," or a problem with standing or doing other activities. *Id.* While Plaintiff referenced difficulty with bending or doing activities he perceived as "too strenuous" as they raised "a possibility [his colostomy bag] might pop off," he also suggested his interest in and ability to do janitorial and construction jobs. *Id.* This seemingly contradicts his comment that he could allegedly not perform certain activity. The only activity Plaintiff emphasized as being noticeably limited by his ostomy bag was sitting (which was accommodated for in the RFC): after negating having any other problems, Plaintiff stated, "[b]ut I do have a problem…sitting." *Id.*

[9]    *See* R. 106 (noting that the Plaintiff does not have postural or exertional limitations); R. 115 (recording Plaintiff can "ambulate without assistance," and that his "ostomy is functioning well and is well healed"); R. 116 (documenting that Plaintiff could "Stand and/or walk with normal breaks for a total of: About 6 hours in an 8-hour workday"); R. 336-37, 349 (finding Plaintiff movement and circulation normal or strong, and his mobility merely "slightly limited," even in immediate aftermath of and during his hospitalization for the perirectal infection).

[10]    For example, the ALJ noted he could help his mother, perform laundry and grocery shopping, prepare food, commute, and work as an election poll attendant. [R. 26.]

aligns with the medium exertion level, contrary to Plaintiff's claim otherwise. The ALJ even explained why Plaintiff is not best suited for light, less restrictive work. [R. 25-26.][11] Thus, the Court finds no support for the claim the ALJ erred in her explanation of why medium level work was appropriate for Plaintiff in light of his colostomy bag. A clear "logical bridge" was built between the evidence offered and relied upon and the ALJ's conclusion.

Additionally, even conceding Plaintiff does not expressly refute the need for additional bathroom breaks as he did the need for a reduction in lifting, carrying, standing, and postural activity—grounds supporting his capacity for medium level work—Plaintiff's argument that the ALJ erred by not including, or in the least discussing, additional bathroom breaks still remains unpersuasive. Plaintiff fails to acknowledge the burden to prove he required such an accommodation belonged to him and not the ALJ. *Summers v. Berryhill*, 864 F.3d 523, 527 (7th Cir. 2017). Rather, Plaintiff tries to foist responsibility to prove the limitations caused by his ostomy bag onto the ALJ. Though it is true "the ALJ in a Social Security hearing has a duty to develop a full and fair record" especially where the claimant appears without counsel, *see Smith*

---

[11]     The ALJ explained she ignored the state medical consultants' recommendation for light work, because: 1) the "evidence and course of [the consultants'] care subsequent to their review" was "exceedingly minimal;" 2) Plaintiff's conditions as of their August 2015 consultations, occurring just after Plaintiff's colostomy surgery and during his adjustment period, was different than that by May 2017, the time for her determination; and 3) by Plaintiff's own admission through his testimony and as evident by his lack of ongoing treatment, he had greater physical functionality in 2017 than in 2015. [R. 26.] On the last part, he specifically corrected the record on the amount of weight he could lift in 2017 (50 pounds, rather than the 10 suggested). *Id.*

As part of Plaintiff's argument, he suggests the ALJ could have deferred to medical experts who would opine whether Plaintiff had colostomy bag restrictions. However, this point falls for two reasons. First, the fact that the ALJ placed more weight on Plaintiff's testimony than on the state agency consultants—with respect to his functional capacity given his colostomy—is a valid exercise of her authority. *Loftis v. Berryhill*, 2017 WL 2311214, at *3 (N.D. Ill. 2017) (explaining that "the RFC is an administrative finding of fact that is within the authority of the ALJ"); *Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) (noting that "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide"). While it is true the ALJ should give controlling weight to the medical opinion of a treating physician where the evidence and medical showings support her doing so, the ALJ can discount the treating physician's opinion where she "offer[s] good reason." 20 C.F.R. § 404.1527(d)(2); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013); *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (internal quotations omitted). Here, the ALJ furnishes good reason (*see supra* paragraph).

Second, even if the ALJ had heeded to the state agency consultants' recommendations, such would still result in a finding for Commissioner. The consultants did not find Plaintiff disabled; the most they did was recommend light level work. [R. 26, 108, 118.] A younger individual—which Plaintiff is, given his age between 18-29 [R. 27]—who can perform a full range of light work is not disabled. 20 C.F.R. Pt. 404, App'x 2, §§ 201.21, 201.28.

*v. Apfel*, 231 F.3d 433, 437 (7th Cir.2000); *Thompson v. Sullivan*, 933 F.2d 581, 585-86 (7th Cir.1991), the court generally defers to the ALJ's discretion on how much to probing is required. *See Nelms v. Astrue*, 553 F.3d 1093, 1098 (7th Cir. 2009) (citation omitted) ("[t]his court generally upholds the reasoned judgment of the [ALJ] on how much evidence to gather, even when the claimant lacks representation."). There is no duty on the ALJ's part to draw out evidence that Plaintiff fails to provide. *Crystal C. v. Berryhill*, 2019 WL 354937, at *3, n.4 (N.D. Ill. Jan. 29, 2019). Rather, "[a] significant omission is usually required before this court will find that the [ALJ] failed to assist *pro se* claimants in developing the record fully and fairly." *Luna v. Shalala,* 22 F.3d 687, 692 (7th Cir. 1994). To justify remanding the case, claimants must highlight "specific, relevant facts—such as medical evidence—that the ALJ did not [but should have] consider[ed]" in her determination. *See Nelson v. Apfel*, 131 F.3d 1228, 1235 (7th Cir.1997).

In the present case, there is no such significant omission of relevant facts in the ALJ's determination. Nothing in the medical record or Plaintiff's testimony speak to Plaintiff's possible need to take additional bathroom breaks to empty his colostomy or ensure its proper connection. During Plaintiff's hearing, the ALJ served her duty of developing the record by asking about all of Plaintiff's colostomy bag-based limitations. [R. 83.] She even pressed Plaintiff twice on the completeness of the record, asking, "Is there anything else that we haven't covered that you think I should know about?" and then following up, "You think we've covered everything?" [R. 87.] Deferring to the ALJ's development of the record and recognizing the ALJ possessed no duty to draw out evidence regarding Plaintiff's bathroom use that Plaintiff failed to provide, the Court takes no issues with the lack of a restriction pertaining to additional bathroom breaks.

In sum, the Court finds no error with the colostomy bag-related limitations addressed in the RFC. The Court declines to remand on either basis regarding Plaintiff's colostomy bag-based needs: that the ALJ should not have included the 20-minute adjustment restriction, or that the ALJ

should have included additional unsubstantiated restrictions (*i.e.*, reduced lifting, carrying, standing, and postural activities, as well as additional bathroom breaks) and further explained Plaintiff's ability to perform medium level work.

### ii. Plaintiff's Visual Acuity

The other area of Plaintiff's RFC to which Plaintiff objects is the ALJ's evaluation of Plaintiff's visual acuity. Plaintiff makes two main arguments regarding the ALJ's finding that Plaintiff could demonstrate occasional near visual acuity. First, he argues the ALJ failed to explain how she considered the 2009 ALJ decision finding Plaintiff did, in fact, have a satisfactory visual impairment to meet the requirements of Listing 2.03. [Dkt. 19 at 5.] Second, he argues, given his significantly limited right eye vision, the ALJ failed to explain how he could demonstrate occasional visual acuity for up to one-third of the workday. *Id.*

With respect to the first contention, the Court finds the ALJ provided adequate explanation of her consideration, but ultimate rejection, of the 2009 ALJ decision. Plaintiff's vision at the time of the 2009 decision was 20/200 in the right eye, with a pinhole field of vision. [R. 94-99.] Plaintiff's left eye vision was confirmed to be somewhere between 20/80 and 20/200, with a pinhole field of vision as well. *Id.* Plaintiff was legally blind in both eyes according to these results. *Id.* Therefore, as explained by the 2017 ALJ decision at issue here, Plaintiff met the requirements of Listing 2.03: Contraction of the Visual Field in the Better Eye, in 2009, as the visual field in the better eye—the left—was less than 20 degrees at that time.

As ALJ Barezky explained, she rejected the 2009 determination—coming before several years of earnings resulting from Plaintiff's medium level work as a home attendant—because it was no longer applicable: Plaintiff's vision in the left eye improved from "legally blind," 20/80 at best with correction in 2009, to "20/70 without correction" and "20/40 with correction" with an "essentially full" field of vision by 2017, a drastic difference. *Id.* The difference was even noted

in Plaintiff's own DIB application; he did not claim general blindness but rather "visual disturbance" of the left eye. [R. 102, 111.] Because the better eye did not meet any of the requirements stated in Listing 2.03, nor those in Listing 2.00 or 2.02, Plaintiff's overall vision could no longer said to be a severe physical impairment. *Id.* Considering the 2015 evidence of Plaintiff's improved, essentially full left eye vision, ALJ Barezky's decision to ignore the 2009 data and ALJ decision, detailing Plaintiff as legally blind in the left eye, allowed her to construct of logical bridge between the relevant evidence and her conclusion. Had she relied on the outdated, irrelevant 2009 data, she would have been forced to ignore the logical implications of the 2015 records with respect to Plaintiff's visual acuity and corresponding limitation. The ALJ's decision in the respect was proper, and thus the Court finds no reason to remand on this basis.

Plaintiff next argues the ALJ failed to explain how Plaintiff, given his significantly limited right eye vision, could demonstrate occasional visual acuity for up to one-third of the workday. But Plaintiff again ignores the logical bridge built by the ALJ from the evidence of Plaintiff relying on his vision on a daily basis, for extended periods of time. [R. 24-26.] Specifically, the ALJ made her determination relying on the fact that, according to Plaintiff's own admission, his near full use of the left eye allowed him to see, for the most part. [R. 24, 79.] The ALJ noted Plaintiff could even read with his left eye, being limited only by "small print." *Id.* Additionally, the ALJ accounted for Plaintiff's testimony on wanting to retain a driver's license, a clear indicator of his capacity to see. During his hearing, when asked if he was trying to get a license, Plaintiff responded affirmatively: "Yeah," he said, expressing further that he would get one so long as he "go[es] to the eye doctor…and get[s] a stronger prescription." [R. 79.] The ALJ clearly relied on this testimony, drawing it as evidence of Plaintiff's ability to demonstrate occasional visual acuity. On this she commented, "He indicated he does not have a driver's license due to history of a DUI, not as a result of his impairments." [R. 24.] The ALJ also rested her conclusion—that the RFC

accommodates Plaintiff's impairment by restricting him to limited, occasional visual acuity—on Plaintiff's other lifestyle indicators, which support the medical evidence establishing Plaintiff's left eye's vision as nearly full.[12] In particular, she made reference to the record demonstrating that he washed dishes, cooked, went to and from church and shops using public transit, laundered clothing, performed his own self-grooming and hygiene, paid his bills, worked as an election poll attendant, and assisted at his mother's home (performing tasks like putting up Christmas lights). [R. 25.] All of this evidence supports a finding that Plaintiff could, in limited spurts, perform tasks associated with some visual acuity. Therefore, the Court finds that the ALJ's conclusion that the Plaintiff has limited visual acuity was one a reasonable mind could come to and, thus, is not a basis for remand.

Based on the foregoing, the Court finds the ALJ's RFC finding supported by substantial evidence as it relates to Plaintiff's limitations with respect to Plaintiff's colostomy bag and vision and will not overturn the ALJ's decision on these bases.

### b. The ALJ Properly Assessed Plaintiff's Subjective Symptoms

Plaintiff also argues the ALJ erred in evaluating Plaintiff's statements addressing the intensity, persistence and limiting effects of his pain and symptoms. [Dkt. 19 at 6-11.] On this, Plaintiff has three main quarrels, each of which the Court will address below.

Under the Social Security Regulations, the ALJ undertakes a two-step process in evaluating a claimant's symptoms and subjective complaints about the severity and nature of the relevant impairments. First, the ALJ must determine whether the claimant has a medically determinable impairment that "could reasonably be expected to produce the pain or other symptoms alleged."

---

[12]   While the only reference to this is from Dr. Hillman's examination, during which Plaintiff's left eye was plotted as having 20/40 vision with an "essentially full" field, nowhere in the other 2015 records is there information to the contrary. [R. 466-70.] Nor does Plaintiff's motion for summary judgement contain any statement that Plaintiff's left eye vision has changed or is worse than Dr. Hillman's assessment demonstrates. [Dkt. 19.]

20 C.F.R. § 404.1529(a). Second, the ALJ evaluates the intensity and persistence of the claimant's symptoms to determine how those symptoms limit the capacity for work. 20 C.F.R. § 404.1519(c). The ALJ's assessment on this issue will only be disturbed if it is "patently wrong." *Taylor v. Berryhill*, 2018 WL 5249234, at *6 (N.D. Ill. Oct. 22, 2018). Reviewing courts examine whether a credibility determination was "reasoned and supported" and "[i]t is only when the ALJ's determination lacks any explanation or support that we will declare it to be "'patently wrong,'" and deserving of reversal. *Elder*, 529 F.3d at 413-14 (citation omitted). An ALJ complies with SSR 96-7p (and 16-3p), and the court will affirm her finding, so long as she "gives specific reasons that are supported by the record." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

Here, Plaintiff first contends the ALJ erred by finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with medical evidence and other evidence in the record…." [R. 24.] Plaintiff argues the phrase "not entirely consistent" suggests that the decision is ridden with "meaningless boilerplate" terminology that makes it patently wrong: according to Plaintiff, this is so because the decision is impermissibly vague, failing to express which exact subjective symptoms were considered less consistent with the record, and because it indicates the ALJ held the Plaintiff to a higher standard than is dictated by the regulations, seemingly requiring a one-to-one correlation between the medical evidence and Plaintiff's statements regarding his symptoms.

The Court rejects this argument in full. Although one might take issue with the ALJ's word choice in using the phrase "not entirely consistent," this Court takes no issue either with the standard of review the ALJ used in evaluating Plaintiff's statements or with the analysis she provided. Plaintiff's fixation over the term "not entirely consistent," seems like the type of nitpicking the Seventh Circuit has cautioned against with respect to ALJ decisions. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citing *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir.

1999) ("ALJ opinion to be given "a commonsensical reading rather than nitpicking at it.") Moreover, the Court has rejected the notion that use of such a phrase means that the ALJ applied an improper standard requiring remand. *See Dawn P. v. Berryhill*, 2019 WL 339603, at *4 (N.D. Ill. Jan. 28, 2019); *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013).

Instead, the Court has favored reading the ALJ's decision holistically, noting that "boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion," where there opinion otherwise rests on information that supports her decision. *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). In looking to the rest of the opinion, it is clear the ALJ largely premised her conclusions on Plaintiff's statements concerning the symptoms reasonably accepted as consistent with the record. [R. 24-26, 76-79, 83-84.] *See Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009) (establishing that the ALJ's decision need not be perfect or "mention every strand of evidence in her decision").

Moreover, the ALJ adjusted Plaintiff's RFC to account for the abilities he possessed pursuant to his subjective pain and symptom levels, even at times where they did not comport with the record: for example, she incorporated a limitation to accommodate his self-professed need to adjust following 20 minutes of sitting, a restriction found nowhere in the record.[13] These allowances by the ALJ counter the suggestion she applied an unreasonable standard by which she discredited his subjective symptom testimony altogether.

Second, Plaintiff argues that the ALJ was required to separately assess each symptom he alleged and identify which "allegations she found to have been supported by evidence, which

---

[13] The ALJ's findings with respect to Plaintiff's abilities to stand, walk, lift up to 50 pounds, and demonstrate limited visual acuity also account for Plaintiff's subjective statements, undermining his contention that his subjective pain and symptom testimony was discredited. In fact, the ALJ was even more deferential to Plaintiff's statements concerning his pain, symptoms, and limitations than were many physicians who attended to him. *See, e.g.,* R. 105 (physician answers, "no," to the question: "Are the individual's statements about the intensity, persistence, and functionally limiting effects of the symptoms substantiated by the objective medical evidence alone?"); R. 115 (physician determines Plaintiff is "Partially Credible" with respect to his symptoms); R. 477-78 (physician indicates Plaintiff's wound is healed and he should not require pain management).

allegation she found to have been not supported by evidence, [and] how supported by evidence she found any particular allegation to have been." [Dkt. 19 at 7.] Here, Plaintiff simply invokes an incorrect and unreasonable standard. "[A]n ALJ's credibility findings need not specify which statements were not credible." *Shideler v. Astrue*, 688 F.3d 308, 312 (7th Cir. 2012) (citation omitted). Again, "[i]t is only when the ALJ's determination lacks *any* explanation or support that [the Court] will declare it to be "'patently wrong[.]'" *Elder*, 529 F.3d at 413-14 (citation omitted) (emphasis added). Plaintiff has failed to convince the Court there was no logical explanation or support provided for the ALJ's conclusions. To the contrary, the Court has already established that many of the limitations provided by Plaintiff's RFC were built from logical bridges between the evidence and the ALJ's conclusions. *See, e.g., supra* at 13-14.

Next, Plaintiff contends the ALJ erred by not explaining how Plaintiff's subjective symptom allegations were inconsistent with his daily activities and his applying to jobs, as well as his self-representation to employers as being able to work. The Court disagrees. The ALJ considered Plaintiff's activities of daily living as part of the assessment of "whether his testimony about the effects of his impairments was credible or exaggerated," not as conclusive proof that Plaintiff was able to work. *Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016). Any findings that credited Plaintiff testimony concerning his daily living activities were further substantiated by substantial evidence. For example, the ALJ cited Plaintiff's testimony that he lived alone, managed his own finances, attended to his own grocery shopping and laundry, and lacked a license for DUI—not vision-related—reasons, all of which add color to her finding that Plaintiff's left eye vision allowed for some rather than no visual acuity, a finding that was otherwise rooted in substantial evidence from the medical record. *See supra* at Discussion, III(a)(ii). Plaintiff is troubled that the ALJ invokes certain daily living activities (*i.e.*, visiting his ill mother) without drawing any connection between the activity and his ability to demonstrate limited occasional

visual acuity for one-third of the day. But, the Court finds otherwise: given Plaintiff's testimony that said visits entailed doing household chores, including hanging Christmas lights, requiring some visual acuity, the ALJ understandably cited that evidence as further corroboration of the medical finding that Plaintiff uses and can use his eyesight for limited and occasional work-related purposes.

Finally, Plaintiff takes issue with the ALJ's reference to Plaintiff's applications to potential employers and self-representation as capable of holding jobs, arguing that "the ALJ impermissibly equated [Plaintiff's] desire to work with an ability to work." [Dkt. 19 at 10.] The Court finds this contention unavailing. Similar to her consideration of Plaintiff's daily living activities, the ALJ pointed to Plaintiff's previous work experience and his behaviors (including applying for jobs as little as a week before the hearing and holding himself out as able to work) merely as corroborative evidence for her conclusion Plaintiff could work, which was already supported by substantial medical evidence. *See* R. 24-27, 108, 118 (all pointing to "not disabled" findings and evidence that Plaintiff could work); *see also Schmidt v. Barnhart*, 395 F.3d 737, 745 (7th Cir. 2005) (expressing that a claimant's representation of his ability and desire to work can be considered in assessing whether he is disabled)*; Dowlen v. Colvin*, 658 F. App'x 807, 812 (7th Cir. 2016) ("Although a claimant can still be found disabled while collecting unemployment benefits or looking for work…an ALJ may take this factor into account in assessing the subjective complaints of disability…."). To the Court, it appears entirely reasonable the ALJ offered, as additional support for her findings that Plaintiff could perform medium level work, Plaintiff's own testimony he was looking for janitorial and construction labor jobs—information that demonstrated Plaintiff considered himself capable of performing strenuous, physical work, despite his ostomy bag and vision, and that directly conflicted with Plaintiff's argument that his impairments were so severe as to render him disabled and unable to work. [R. 25-26, 82-87.] In sum, the Court finds the ALJ's

consideration of the Plaintiff's daily living activities and work history and desires appropriate among her analysis of his subjective symptoms.

For the reasons above, the Court concludes that each aspect of the ALJ's subjective symptom evaluation is supported by substantial evidence. The Court will not overturn the ALJ's decision on this basis.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Commissioner's motion for summary judgment [dkt. 26] is granted and Plaintiff's motion [dkt. 19] is denied. The final decision of the Commissioner is affirmed.

Entered: 7/26/2019

Susan E. Cox,
United States Magistrate Judge